759 F.2d 796
 George J. SHAMAS, as Administrator and Personal
Representative of the Estate of Lewis Harold
Shelton, deceased, and Lorraine E.
Shelton, Plaintiffs-Appellees,
v.
KOCH INDUSTRIES, INC., and W.A. Moncrief dba Moncrief Oil,
Defendants-Appellants.
 Nos. 83-1713, 83-1888.
 United States Court of Appeals,
Tenth Circuit.
 April 12, 1985.
 
 Robert H. Henderson (Michael R. Carlston, with him on the briefs) both of Snow, Christensen & Martineau, Salt Lake City, Utah, for defendants-appellants.
 Anthony M. Thurber, Salt Lake City, Utah, for plaintiff-appellee Lorraine Shelton.
 Michael F. Richman, Douglas L. Davies and Caryn L. Beck-Dudley, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for plaintiff-appellee George J. Shamas.
 Before LOGAN and BREITENSTEIN, Circuit Judges and O'CONNOR*, District Judge.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 This is an appeal, after a court trial, from an order and judgment of the United States District Court of the District of Utah finding that plaintiffs-appellees, Ralph Shelton, administrator of the estate of Lewis Harold Shelton, and Lorraine Shelton, the sole heir of Lewis Shelton, were justified in rescinding an oil and gas lease with the defendants-appellants, Koch Industries, Inc. (Koch) and W.A. Moncrief, dba Moncrief Oil. No. 83-1713 is an appeal from a bench order and No. 83-1888 is an appeal from written order. Ralph Shelton died during the pendency of these appeals and Shamas, administrator of the estate of Lewis Shelton, was substituted for him. We affirm.
 
 
 2
 The Shelton estate includes the mineral interests involved in this case. Tr. Vol. IV, pp. 33-34; Tr. Vol. V, pp. 230-231. In September or October, 1978, Koch commenced drilling two wells, Bates 9-1 and Reimann 10-1 in Duchesne County, Utah. Tr. Vol. IV, pp. 50, 114. These wells were not drilled on Shelton property, but the Shelton mineral interests were a part of the drilling unit communitized by Koch. Id. at 50. In November, 1978, both the Bates and Reimann wells commenced production. Id. at 116.
 
 
 3
 Coleman, landman and agent for Koch, wrote Ralph Shelton in May, 1978, proposing that Shelton execute a lease granting Koch the estate's mineral interest in return for a royalty to the estate for one-sixth of the estate's interest in the production obtained. Id. at 34-35. In June, 1978, Coleman wrote Lorraine Shelton requesting that she execute a similar lease. Neither Ralph nor Lorraine Shelton acted on these requests.
 
 
 4
 On January 4, 1979, Coleman telephoned Lorraine Shelton in an attempt to persuade her to sign the lease. Id. at 123. Her interest was the only unsigned interest in the communitized area. Id. at 122. She testified that she asked Coleman what the consequences would be if she failed to sign the lease and was told by him that she would be charged with her share of the drilling expenses as part owner of the well. Id. at 167. She also testified that Coleman told her that, even if Koch hit a dry hole, she would be responsible for her share of the drilling expense unless she signed the lease. Id. at 168.
 
 
 5
 Ralph, who was visiting Lorraine at that time, testified that he asked Coleman where Koch planned to drill and was told that a drill site had not been selected and would not be selected until enough property had been obtained to make drilling worthwhile. Id. at 44. Ralph then asked Coleman where the closest well was to the Shelton location. Coleman responded that Koch's nearest well was along Highway 40 which was a mile and one-half from the Shelton property. Id. at 44, 60.
 
 
 6
 Lorraine signed the lease on February 1, 1979. Id. at 175. She testified that her reason for so doing was to avoid the expense involved in drilling. Id.; Tr. Vol. V, p. 227.
 
 
 7
 In March, 1979, Coleman telephoned Lorraine Shelton to procure an amendment to the lease changing the effective date from January 4, 1979, to October 15, 1978. Tr. Vol. IV, pp. 176-177. She testified that Coleman told her that if she did not sign the amendment, she would receive an one-eighth interest instead of the one-sixth interest agreed to under the lease. Id. at 178. She also testified that Coleman failed to inform her that the wells were producing. Id. Coleman contends that he did explain that the wells were producing. Tr. Vol. V, pp. 268-269. Lorraine signed the amendment in April, 1979. Tr. Vol. IV, p. 179.
 
 
 8
 Ralph Shelton testified that in August, 1979, he travelled to Duchesne County, Utah and discovered for the first time that the wells had been producing since November, 1978. Id. at 49-51. Shelton retained counsel to rescind the lease in October, 1979. Tr. Vol. VI, p. 365. On or about October, 1979, Shelton's attorney wrote Koch tendering a check to Koch for $1,271.09, the bonus which Lorraine had received when she signed the lease, and notified Koch that the Sheltons were cancelling the lease. Koch returned the check and refused to cancel. Id. at 368-369. Lorraine authorized a suit against Koch by letter of December 13, 1979. Id. at 370. On May 30, 1980, the Sheltons, represented by different counsel, brought suit against Koch and Moncrief, the joint owners of Bates 9-1 and Reimann 10-1 wells, alleging two grounds for recission, fraud and lack of capacity on Lorraine's part to enter into the lease. R. 1, 5-6. The trial court granted partial summary judgment in favor of the defendants, holding that Lorraine did have sufficient capacity to enter into the lease. R. 48, 51-52; Tr. Vol. III, p. 21.
 
 
 9
 After hearing evidence, the trial court ruled that Coleman had fraudulently misrepresented material facts which justified setting aside the lease. Tr. Vol. V, pp. 344-346; R. 112. The trial court also ruled that the Sheltons rescinded the lease in a timely fashion. Tr. Vol. VI, pp. 408-409.
 
 
 10
 Appellants argue that Coleman did not misrepresent material facts to the Sheltons. The trial court found that production was a material fact and that Coleman knew or should have known that the wells were producing. Tr. Vol. V, pp. 344-345. The trial court found that Coleman's failure to disclose this fact on January 4, 1979, was a negligent misrepresentation. Id. at 344-346. It also found that Coleman negligently misrepresented to Lorraine the consequences of failing to sign the amendment to the lease. Under the Utah force-pooling statute then in effect, Utah Code Ann. (1981) Sec. 40-6-6, she would have been entitled to a one-eighth percentage of her interest free of any costs. Tr. Vol. V, p. 300.
 
 
 11
 On a trial to the court, resolution of factual issues and conflicting evidence lies solely within the province of the district court. Cowles v. Dow Keith Oil & Gas, Inc., 10 Cir., 752 F.2d 508, 511. The court's findings of fact are presumptively correct and should not be set aside on appeal unless clearly erroneous. Id. A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a firm and definite conviction that a mistake has been made. Id. In the case at bar there is substantial evidence in the record to support the findings of the trial court. Implicit in its ruling that Coleman misrepresented to the Sheltons that production had not commenced is the decision to believe the Sheltons and not Coleman. The court had the opportunity to hear and observe the witnesses and to judge their credibility. The trial court did not abuse its discretion in finding that Coleman negligently misrepresented material facts. See United States v. Hubbard, 10 Cir., 603 F.2d 137, 142-143.
 
 
 12
 Appellants contend that our decision in Peterson v. Koch Industries, Inc., 10 Cir., 684 F.2d 667, requires a reversal of the trial court's ruling that the Sheltons were entitled to rescind. Peterson was concerned with an oil and gas lease between Koch and a minor and involving the Bates 9-1 and Reimann 10-1 wells in Duchesne County. Coleman failed to volunteer information that the wells were producing. We held in Peterson, supra 684 F.2d at 671-672, that:
 
 
 13
 "appellees were under no duty to disclose to Peterson that production had been achieved, particularly when, as here, Peterson did not inquire and appellees' relationship with Peterson was at arm's length, outside the parameters of a fiduciary relationship."
 
 
 14
 In the telephone conversation on January 4, 1979, Shelton inquired whether wells had been commenced in September and November, 1978, and Coleman answered falsely. Tr. Vol. IV, p. 45. In Peterson, Id., we quoted 4 Summers Oil & Gas Sec. 662 thus:
 
 
 15
 "[I]f there is an active misrepresentation in addition to nondisclosure ... the contract may be held fraudulent .... If the lessee is asked if he has tested the land, or knows of the existence of oil and gas structure, he may remain silent, but if he undertakes to answer, he must tell the truth."
 
 
 16
 We noted that Utah has adopted a similar position. Id.
 
 
 17
 In Cheever v. Schramm, Utah, 577 P.2d 951, 954, the Utah Supreme Court adopted the following requirements that a party asserting fraud must prove:
 
 
 18
 "1) that a representation was made; 2) concerning a presently existing material fact; 3) which was false; 4) which the one making the representation either a) knew to be false, or b) made recklessly knowing he had insufficient knowledge upon which to base such representation; 5) for the purpose of inducing the other party to act upon it; 6) that the other party acting reasonably and in ignorance of its falsity; 7) did in fact rely on it; 8) and was thereby induced to act; 9) to its injury and damage."
 
 
 19
 The representation was made that production had not commenced. Coleman admitted this was material. The trial court held that the representation was false and that Coleman knew or should have known it was false. Coleman admitted that he was interested in obtaining the lease on the Sheltons' mineral interests. Requirements one through five were clearly met. The seventh requirement is satisfied by Lorraine's uncontradicted testimony that she signed the lease to avoid the expenses of drilling. The eighth requirement is satisfied by Lorraine's testimony that had she known there were producing wells, she might not have signed the lease. Tr. Vol. IV, p. 175. As to requirement nine, she signed the lease to her injury and damage.
 
 
 20
 Appellants argue that the sixth requirement is not met because the appellees did not inspect their own land. Appellants cite Pace v. Parrish, 122 Utah 141, 247 P.2d 273, to support their argument. In Pace the Utah Supreme Court held that purchasers of a farm were not entitled to rely on the seller's representation that river bottom land on the farm was of good quality. The purchasers had the opportunity to inspect the land and a casual inspection would have revealed that the land was obviously rocky. Id. 247 P.2d at 275.
 
 
 21
 The Utah court held that the purchasers were entitled to rely on the seller's representation as to the condition of the fences where those in disrepair were remote from the area inspected. The court also held that the purchasers were entitled to rely on the representation that a reservoir located on the property belonged to the seller when, in fact, it did not. Id. at 275-276. The Utah court said, Id.: "The full measure of plaintiff's duty was to use reasonable care and observation in connection with these representations. Having done so, it does not lie in defendant's mouth to say that they were too gullible and shouldn't have believed him."
 
 
 22
 Ralph Shelton resided in Phoenix, Arizona, and Lorraine Shelton in San Bernardino, California. The land is in Duchesne County, Utah. To require them to travel to Utah to inspect their property for wells which they were told did not exist would be to require much more than the Utah court declined to require in Pace v. Parrish with regard to the fences and the reservoir. The sixth requirement of Cheever v. Schramm was satisfied. Having met all of the requirements of Utah law, the Sheltons were entitled to rescind.
 
 
 23
 Appellants argue that the Sheltons did not act within a reasonable time to rescind the lease but waited until the wells were profitable to do so. In October, 1979, Ralph Shelton's attorney wrote Koch tendering a check for the bonus Lorraine had received and notifying Koch that the Sheltons were cancelling the lease. In December, 1979, the attorney was authorized to sue Koch. He did not do so and another attorney brought suit on May 30, 1980. From charts prepared by the defense, Shelton testified that the wells passed the break-even point in March, 1980. Tr. Vol. VI, p. 372. The trial court found that appellants failed to demonstrate that the Sheltons had specific knowledge as to when the wells became profitable and did not wait an unreasonable time to rescind. In Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 10 Cir., 303 F.2d 527, 531, quoting 1 A.L.R.2d 1084, 1085, that:
 
 
 24
 "A party entitled to avoid a transaction does so by giving notice to the other party of his decision to do so. By this notice the contract is abrogated .... Naturally the consent of the other party, and his return of the consideration, has never been deemed a prerequisite to the effectiveness of the annulment."
 
 
 25
 The October, 1979, letter effectively exercised the Sheltons' right to rescind the lease. Appellants' argument that the Sheltons played the market before electing to rescind is without merit.
 
 
 26
 Affirmed.
 
 
 
 *
 Chief Judge of the United States District Court for the District of Kansas, sitting by designation